# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In Re:                                                    CHAPTER 7 CASE

Kathleen Carol Sherman                                    CASE NO. 10-34681

                    Debtor(s).                     NOTICE OF HEARING AND MOTION FOR
_____                          RELIEF FROM STAY

TO:  Debtor and other entities specified in Local Rule 9013-3(a).

      1.      U.S. Bank, N.A., its successors and/or assigns, (hereinafter "Movant"), by its

undersigned attorney moves the Court for the relief requested below and gives notice of hearing

herewith.

      2.      The Court will hold a hearing on this motion on October 20, 2010, at 1:30 PM, or

as soon thereafter as counsel can be heard, before the Honorable Judge Dennis D. O'Brien in

Courtroom 2B of the above entitled Court located at 316 Robert St N, Saint Paul MN, 55101-

1241.

      3.      Any response to this motion must be filed and served by delivery not later than

October 15, 2010, which is five days before the time set for the hearing (including Saturdays,

Sundays and holidays).  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY

FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

      4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and

1334, Federal Rule of Bankruptcy Procedure 5005 and Local Rule 1070-1.  This proceeding is a

core proceeding.  The petition commencing this case was filed on June 24, 2010.  The case is

now pending in this Court.

      5.      This motion arises under 11 U.S.C. § 362 and Federal Rule of Bankruptcy

Procedure 4001.  This motion is filed under Federal Rule of Bankruptcy Procedure 9014 and

Local Rules 9013-1 - 9019-1.  Movant requests relief from the automatic stay with respect to property subject to a lien.  Movant requests said relief be effective immediately notwithstanding Federal Rule of Bankruptcy Procedure 4001(a)(3).

6.      Debtor is indebted to Movant in the original principal amount of $123800.00, as evidenced by that certain Promissory Note dated December 23, 2002, a copy of which is attached hereto as Exhibit "A", together with interest thereon.

7.      Debtor's indebtedness is secured by a mortgage on real estate in which Debtor has an interest as evidenced by that certain mortgage deed dated December 23, 2002, executed by Kathleen C Sherman, unmarried, filed for record in the office of the County Recorder on March 07, 2003, as Document Number 2011165, Dakota County, State of Minnesota, a copy of which is attached hereto as Exhibit "B".  The name and address of the original creditor is contained in the attached Exhibit "B".  The property is located in Dakota County, Minnesota and is legally described as follows to wit:

> Unit No. 51, Prairie Crossing Villas, Common Interest Community No. 241,  a condominium located in Dakota County, Minnesota.

Movant is now the holder of said mortgage and is entitled to enforce the terms thereof.

8.      At all times material, Debtor was in default of the payments and performance of obligations to Movant.

9.      Pursuant to 11 U.S.C. § 362(g) the burden is on Debtor to prove absence of cause and/or adequate protection.  This Movant's interest in the property is not adequately protected where, as of September 29, 2010, Debtor is delinquent for monthly payments as required for the months of November 2009 to July 2010 in the amount of $820.28 per month; August 2010 to September 2010 in the amount of $820.25 per month; accruing monthly late charges; and attorney's fees and costs of $700.00.  Debtor has failed to make any offer of adequate protection.

10.     Debtor has no equity in the property and the property is not necessary to an effective reorganization.  The value of the property as scheduled by Debtor is $121,100.00, subject to Movant's mortgage in excess of $119,209.32.  The property is also subject to a Junior Mortgage in favor of Principal Residential Mortgage in excess of $40,000.00.

11.     Movant desires to protect its interest in the aforementioned property and requests the Court to vacate the stay of actions and allow foreclosure pursuant to Minnesota law.

12.     Movant has incurred and will incur legal fees and costs to protect and enforce its rights in the subject property.

WHEREFORE, Movant, by its undersigned attorney, moves the Court for an order for judgment that the automatic stay provided by 11 U.S.C. § 362(a) be terminated so to permit the Movant to commence mortgage foreclosure proceedings under Minnesota law and for such other relief as may be just and equitable.

Dated: September 29, 2010

**WILFORD & GESKE, P.A.**


/e/ James A. Geske
James A. Geske, #14969X
Attorneys for U.S. Bank, N.A., its successors and/or assigns
8425 Seasons Parkway, Suite 105
Woodbury, MN 55125-4393
(651) 209-3300

**THIS COMMUNICATION IS FROM A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

WE CERTIFY THAT THIS IS A
TRUE COPY OF THE ORIGINAL
OLD REPUBLIC TITLE

# BALLOON NOTE
## (FIXED RATE)

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

DECEMBER 23,2002          BLOOMINGTON          MINNESOTA
[Date]                    [City]               [State]

15071 DUNWOOD TRAIL, APPLE VALLEY, MINNESOTA 55124
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $     123,800.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
**U.S. BANK N.A.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     5.500     %.

The interest rate required by Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the **FIRST** day of each month beginning on **FEBRUARY 1,2003**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on     **JANUARY 1,2010**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

**MULTISTATE BALLOON NOTE (FIXED RATE) - Single Family - Freddie Mac UNIFORM INSTRUMENT**



EXHIBIT A



I will make my monthly payments at   4801 FREDERICA STREET, OWENSBORO, KY  42301
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payments will be in the amount of U.S. $        702.93

## 4.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sum already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.   BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
5.000              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

Form 3290 1/01

Initials:

-869N (0005)

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of the Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the rights to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

-869N (0005)

Form 3200 1/01
Initials:

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

SEE BALLOON NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

_____ (Seal)          _Kathleen C. Sherman_____ (Seal)
                           -Borrower              KATHLEEN C SHERMAN            -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                         -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                         -Borrower


_____ (Seal)          _____ (Seal)
                           -Borrower                                         -Borrower


*[Sign Original Only]*

2011165

DOC. NO. 2011165

OFFICE OF THE COUNTY RECORDER
DAKOTA COUNTY, MINNESOTA
CERTIFIED THAT THE WITHIN INSTRUMENT
WAS RECORDED IN THIS OFFICE ON AND AT
2003 MAR -7 PM 3: 15

JOEL T. BECKMAN, COUNTY RECORDER
BY _____ Deputy
FEE _____ SURCHARGE 5.00
CASH ☐ CHECK ☐ ESCROW ☒
WELL ☐ CHARGE ☐
CHARGE TO: _____
O/R _____

OLD REPUBLIC TIT: :::

DAKOTA COUNTY TREASURER-AUDITOR
03/04/2003 18:56:19  749250
REGISTRATION TAX        204.74
COUNTY CONSERVATION FEE   5.00
RECEIPT NUMBER  3363

COPY DEL'D

─────── [Space Above This Line For Recording Data] ───────

LOAN: # ▮▮▮▮▮▮

Old Republic Title: 2002100069.W

# MORTGAGE

Return To: U.S. BANK N.A.
        221 W CHERRY
        NEVADA MO 64772

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  DECEMBER 23, 2002
together with all Riders to this document.

MINNESOTA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3024  1/01

-6(MN) (0005)
Page 1 of 15          Initials: ____
VMP MORTGAGE FORMS - (800)521-7291

RECEIVED
'JAN 2 7 2003
DAKOTA COUNTY
TREASURER-AUDITOR

EXHIBIT 

**(B) "Borrower"** is

KATHLEEN C SHERMAN (UNMARRIED)

Borrower is the mortgagor under this Security Instrument.

**(C) "Lender"** is U.S. BANK N.A.

Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES OF AMERICA
Lender's address is 4801 FREDERICA STREET, OWENSBORO, KY  42301

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated DECEMBER 23,2002
The Note states that Borrower owes Lender  ONE HUNDRED TWENTY THREE THOUSAND EIGHT
HUNDRED AND  NO/100                                                          Dollars
(U.S. $    123,800.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than JANUARY 1,2010         .

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☒ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

Initials: KCS

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the   **PUBLIC RECORDS**                                                    [Type of Recording Jurisdiction]
of  **DAKOTA COUNTY**                                [Name of Recording Jurisdiction]:
**UNIT NO. 51, PRAIRIE CROSSING VILLAS, COMMON INTEREST COMMUNITY NO. 241, A CONDOMINIUM LOCATED IN DAKOTA COUNTY, MINNESOTA**

Parcel ID Number:      01-76900-051-06                which currently has the address of
**15071 DUNWOOD TRAIL**                                                                   [Street]
**APPLE VALLEY**                                    [City], Minnesota  **55124**       [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

Initials: KCS

Form 3024  1/01

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or

Initials

Form 3024   1/01

-6(MN) (0005)

consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by

Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be

Initials: _KᴄS_

Form 3024  1/01

treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument at the time such documents are executed or within a reasonable time thereafter.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may



reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower by certified mail to the address of the Property or another address designated by Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees.**

**If Lender invokes the power of sale, Lender shall cause a copy of a notice of sale to be served upon any person in possession of the Property. Lender shall publish a notice of sale, and the Property shall be sold at public auction in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**25. Interest on Advances.** The interest rate on advances made by Lender under this Security Instrument shall not exceed the maximum rate allowed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____

_____ *Kathleen C Sherman* (Seal)
KATHLEEN C SHERMAN                    -Borrower

_____ (Seal)
                                      -Borrower

_____ (Seal)     _____ (Seal)
                          -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                          -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                          -Borrower                            -Borrower

**STATE OF MINNESOTA,**     HENNEPIN                    County ss:

      On this   23RD       day of     DECEMBER, 2002            , before me appeared

KATHLEEN C SHERMAN, UNMARRIED

to me personally known to be the person(s) described in and who executed the foregoing instrument and acknowledged that he/she/they executed the same as his/her/their free act and deed.

_____

Notary Public
My Commission Expires:

MARY WALLIS
Notary Public
Minnesota
My Commission Expires January 31, 2005

This instrument was drafted by:
ANGELA WOODBECK
U.S. BANK N.A.
1550 EAST 79TH STREET
BLOOMINGTON, MN 55425

Tax statements for the real property described in this instrument should be sent to:
U.S. BANCORP SERVICE PROVIDERS LLC
4801 FREDERICA STREET
OWENSBORO, KY 42301

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this        23RD        day of DECEMBER        2002 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to
        U.S. BANK N.A.

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
        15071 DUNWOOD TRAIL, APPLE VALLEY, MINNESOTA 55124

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a
condominium project known as:
        PRAIRIE CROSSING VILLAS

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium
Project (the "Owners Association") holds title to property for the benefit or use of its members or
shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds
and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the
Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any
other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other
equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to
the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender
and which provides insurance coverage in the amounts (including deductible levels), for the periods, and
against loss by fire, hazards included within the term "extended coverage," and any other hazards, including,
but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the

**MULTISTATE CONDOMINIUM RIDER**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)      *Kathleen C. Sherman*  _____ (Seal)
                         -Borrower   KATHLEEN C SHERMAN             -Borrower


_____ (Seal)      _____ (Seal)
                         -Borrower                            -Borrower


_____ (Seal)      _____ (Seal)
                         -Borrower                            -Borrower


_____ (Seal)      _____ (Seal)
                         -Borrower                            -Borrower

# BALLOON RIDER
## (CONDITIONAL RIGHT TO REFINANCE)

THIS BALLOON RIDER is made this **23RD** day of **DECEMBER** **2002** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Note to
**U.S. BANK N.A.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
   **15071 DUNWOOD TRAIL, APPLE VALLEY, MINNESOTA 55124**

[Property Address]

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the "Note Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

ADDITIONAL COVENANTS. In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or the Note):

1. CONDITIONAL RIGHT TO REFINANCE

At the maturity date of the Note and Security Instrument (the "Note Maturity Date"), I will be able to obtain a new loan ("New Loan") with a new Maturity Date of **JANUARY 1,2033**
(the "New Maturity Date") and with an interest rate equal to the "New Loan Rate" determined in accordance with Section 3 below if all the conditions provided in Sections 2 and 5 below are met (the "Conditional Refinance Option"). If those conditions are not met, I understand that the Note Holder is under no obligation to refinance the Note or to modify the Note, reset the Note Rate, or extend the Note Maturity Date, and that I will have to repay the Note from my own resources or find a lender willing to lend me the money to repay the Note.

2. CONDITIONS TO OPTION

If I want to exercise the Conditional Refinance Option, certain conditions must be met as of the Note Maturity Date. These conditions are: (a) I must still be the owner and occupant of the property subject to

**MULTISTATE BALLOON RIDER (Refinance) - Single Family - Freddie Mac UNIFORM INSTRUMENT**

the Security Instrument (the "Property"); (b) I must be current in my monthly payments and cannot have been more than 30 days late on any of the 12 scheduled monthly payments immediately preceding the Note Maturity Date; (c) there are no liens, defects, or encumbrances against the Property, or other adverse matters affecting title to the Property (except for taxes and special assessments not yet due and payable) arising after the Security Instrument was recorded; (d) the New Loan Rate cannot be more than 5 percentage points above the Note Rate; and (e) I must make a written request to the Note Holder as provided in Section 5 below.

## 3. CALCULATING THE NEW LOAN RATE

The New Loan Rate will be a fixed rate of interest equal to the Federal Home Loan Mortgage Corporation's required net yield for 30-year fixed rate mortgages subject to a 60-day mandatory delivery commitment, plus one-half of one percent (0.5%), rounded to the nearest one-eighth of one percent (0.125%) (the "New Loan Rate"). The required net yield shall be the applicable net yield in effect on the date and time of day that the Note Holder receives notice of my election to exercise the Conditional Refinance Option. If this required net yield is not available, the Note Holder will determine the New Loan Rate by using comparable information.

## 4. CALCULATING THE NEW PAYMENT AMOUNT

Provided the New Loan Rate as calculated in Section 3 above is not greater than 5 percentage points above the Note Rate and all other conditions required in Section 2 above are satisfied, the Note Holder will determine the amount of the monthly payment that will be sufficient to repay in full (a) the unpaid principal, plus (b) accrued but unpaid interest, plus (c) all other sums I will owe under the Note and Security Instrument on the Note Maturity Date (assuming my monthly payments then are current, as required under Section 2 above), over the term of the New Loan at the New Loan Rate in equal monthly payments. The result of this calculation will be the new amount of my principal and interest payment every month until the New Loan is fully paid.

## 5. EXERCISING THE CONDITIONAL REFINANCE OPTION

The Note Holder will notify me at least 60 calendar days in advance of the Note Maturity Date and advise me of the principal, accrued but unpaid interest, and all other sums I am expected to owe on the Note Maturity Date. The Note Holder also will advise me that I may exercise the Conditional Refinance Option if the conditions in Section 2 above are met. The Note Holder will provide my payment record information, together with the name, title and address of the person representing the Note Holder that I must notify in order to exercise the Conditional Refinance Option. If I meet the conditions of Section 2 above, I may exercise the Conditional Refinance Option by notifying the Note Holder no earlier than 60 calendar days and no later than 45 calendar days prior to the Note Maturity Date. The Note Holder will calculate the fixed New Loan Rate based upon the Federal Home Loan Mortgage Corporation's applicable published required net yield in effect on the date and time of day notification is received by the Note Holder and as calculated in Section 3 above. I will then have 30 calendar days to provide the Note Holder with acceptable proof of my

required ownership, occupancy and property lien status. Before the Note Maturity Date the Note Holder will advise me of the new interest rate (the New Loan Rate), new monthly payment amount and a date, time and place at which I must appear to sign any documents required to complete the required refinancing. I understand the Note Holder will charge me a $250 processing fee and the costs associated with the exercise of the Conditional Refinance Option, including but not limited to the cost of updating the title insurance policy.

BY SIGNING BELOW, BORROWER accepts and agrees to the terms and covenants contained in this Balloon Rider.

_____ (Seal)
-Borrower

*Kathleen C. Sherman* _____ (Seal)
KATHLEEN C SHERMAN                    -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*[Sign Original Only]*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In Re:                                     CHAPTER 7 CASE

Kathleen Carol Sherman                     CASE NO. 10-34681

                  Debtor(s).               MEMORANDUM IN SUPPORT OF
_____          MOTION FOR RELIEF FROM STAY

## ARGUMENT

**I.      CAUSE EXISTS FOR THE GRANTING OF RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1) WHERE THE INTEREST OF THIS MOVANT IS NOT ADEQUATELY PROTECTED.**

Pursuant to 11 U.S.C. § 362(g) the burden is on Debtor to prove absence of cause and/or adequate protection.  Movant's interest in the property is not adequately protected where:

1.      As of September 29, 2010, Debtor is delinquent for monthly payments as required for the months of November 2009 to July 2010 in the amount of $820.28 per month; August 2010 to September 2010 in the amount of $820.25 per month; accruing monthly late charges; and attorney's fees and costs of $700.00.

2.      Debtor has failed to make any offer of adequate protection.

Furthermore, Debtor has failed to meet its contractual obligations to make payments as they become due after the filing of the bankruptcy petition, which failure constitutes "cause" entitling the Movant to relief from the automatic stay under 11 U.S.C. § 362(d)(1).  A continued failure by Debtor to maintain regular payments to Movant is sufficient cause to entitle Movant to relief from the automatic stay.  See In re Taylor, 151 B.R. 646 (E.D.N.Y., 1993) and In re Davis, 64 B.R. 358 (Bkrtcy. S.D.N.Y., 1986).

**II.      THE AUTOMATIC STAY SHOULD BE MODIFIED PURSUANT TO 11 U.S.C. § 362(d)(2) WHERE (1) DEBTOR DOES NOT HAVE ANY EQUITY IN THE PROPERTY, AND (2) THE PROPERTY IS NOT NECESSARY TO AN EFFECTIVE REORGANIZATION.**

The first requirement under § 362(d)(2) is met where the total of all the encumbrances against the property is in excess of the value of the property. The value of the property as scheduled by Debtor is $121,100.00, subject to Movant's mortgage in excess of $119,209.32. The property is also subject to a Junior Mortgage in favor of Principal Residential Mortgage in excess of $40,000.00.

CONCLUSION

Movant is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for cause, and where its interest in the secured property is not adequately protected. Movant is also entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) where Debtor has no equity in the property, and where the property is not necessary to an effective reorganization.

Movant respectfully requests an order of this Court modifying the automatic stay consistent with the attached proposed Order.

Dated: September 29, 2010

**WILFORD & GESKE, P.A.**


/e/ James A. Geske
James A. Geske, #14969X
Attorneys for U.S. Bank, N.A., its successors
and/or assigns
8425 Seasons Parkway, Suite 105
Woodbury, MN 55125-4393
(651) 209-3300

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In Re:                                          CHAPTER 7 CASE

Kathleen Carol Sherman                          CASE NO. 10-34681

         Debtor(s).              AFFIDAVIT OF U.S. BANK, N.A., ITS
                                                SUCCESSORS AND/OR ASSIGNS

Olivia A. Todd, being first duly sworn on oath, deposes and states:

That I am President of National Default Servicing Corporation authorized outsourcing agent for U.S. Bank, N.A., its successors and/or assigns.

1.    That U.S. Bank, N.A., its successors and/or assigns, is now the holder of a mortgage on real property in which the debtor has an interest. The debtor's indebtedness is evidenced by that certain mortgage deed dated December 23, 2002, executed by Kathleen C Sherman, unmarried, recorded on March 07, 2003, as Document No. 2011165, covering real estate located in Dakota County, Minnesota, legally described as follows, to wit:

Unit No. 51, Prairie Crossing Villas, Common Interest Community No. 241,  a condominium located in Dakota County, Minnesota.

and commonly known as 15071 Dunwood Trl, Apple Valley, MN 55124

2.    That I have reviewed the account records relating to the debtor's mortgage loan, account no. ending in 1056.

3.    That as of September 07, 2010, the following amounts were owing on this account:

| | |
|---|---|
| Unpaid Principal Balance | $110,439.89 |
| Interest through September 07, 2010 | $5,667.83 |
| Attorney Fees and Costs | $700.00 |
| Late Charges | $140.60 |
| Negative Escrow Balance | $351.87 |
| Property Inspections | $80.00 |
| Recoverable Balance | $2,286.00 |
| Credits/Suspense | ($456.87) |
| TOTAL: | $119,209.32 |

4.    That the mortgage loan is delinquent for monthly payments as required for the months of November 2009 to July 2010 in the amount of $820.28 per month; August 2010 to September 2010 in the amount of $820.25 per month; and accruing monthly late charges.

Attached is a complete loan history beginning on the date of default and continuing through the month of September 2010.

     5.     The current tax-assessed value of the property and the Movant's estimated current market value is $124,100.00, subject to the Movant's mortgage in excess of $119,209.32. The property is also subject to a Junior Mortgage in favor of Principal Residential Mortgage in excess of $40,000.00.

     6.     This affidavit is given in support of the motion of U.S. Bank, N.A., its successors and/or assigns for relief from the automatic stay.

U.S. Bank, N.A., its successors
and/or assigns

By _____

Olivia A. Todd
President of National Default
Servicing Corporation

Subscribed and sworn to before me on September 27th, 2010.

_____
Pamela Cardy, Notary Public

Pamela Cardy
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
JUNE 8, 2011

| Date | Amount Rec'd From Debtor(s) | Monthly Amount Due Principal/Interest | Monthly Amount Due Escrow | Amount Due Late Fees | Amount Due Other Charge* | Description of Other Charge |
|---|---|---|---|---|---|---|
| 9-Nov | $0.00 | $702.93 | $117.35 | $35.15 | | |
| 9-Dec | $1,049.00 | $702.93 | $117.35 | $35.15 | | Applied to 9/09 & 10/09 |
| 10-Jan | $0.00 | $702.93 | $117.35 | $0.00 | | |
| 10-Feb | $525.00 | $702.93 | $117.35 | $0.00 | | Applied to 10/09 |
| 10-Mar | $0.00 | $702.93 | $117.35 | $0.00 | | |
| 10-Apr | $0.00 | $702.93 | $117.35 | $0.00 | | |
| 10-May | $0.00 | $702.93 | $117.35 | $0.00 | | |
| 10-Jun | $0.00 | $702.93 | $117.35 | $0.00 | | |
| 10-Jul | $0.00 | $702.93 | $117.35 | $0.00 | | |
| 10-Aug | $0.00 | $702.93 | $117.32 | $0.00 | | |
| 10-Sep | $0.00 | $702.93 | $117.32 | $0.00 | | |
| TOTALS | $1,574.00 | $7,732.23 | $1,290.79 | $70.30 | $0.00 | |
| | (a) | (b) | ( c ) | (d) | (e) | |

* Any "Other Charge" must be described, itemized by amount and allowed under note and/or mortgage (e.g., inspection fee, appraisal fee, insurance, taxes, etc.)

**NOTE: Columns (b) + (c)+ (d)+(e) -(a) must equal the current amount that is claimed in the motion**

Attorneys fees and filing fee for the motion, if allowed under note and/or mortgage and        $700.00

Current Default Amount Claimed in the Motion        $7,519.32

Escrow Balance (amount held for payment of taxes, insurance, etc)        ($351.87)

Suspense Account Balance (amount of unapplied payments)        $456.87

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In Re:                                          CHAPTER 7 CASE

Kathleen Carol Sherman                          CASE NO. 10-34681

                    Debtor(s).                  UNSWORN DECLARATION FOR PROOF
                                                OF SERVICE
_____

       Maria Boelen, employed by Wilford & Geske, P.A., attorneys licensed to practice law in
this Court, with office address at 8425 Seasons Parkway, Suite 105, Woodbury, MN 55125-
4393, declares that on September 29, 2010, I served the annexed Notice of Hearing and Motion
for Relief from Stay, Memorandum in Support of Motion for Relief from Stay, Affidavit of U.S.
Bank Home Mortgage, and proposed Order to each person referenced below, a copy thereof by
enclosing the same in an envelope with first class postage prepaid and depositing same in the
post office at Woodbury, Minnesota addressed to each of them as follows:

Kathleen Carol Sherman
15071 Dunwood Trl
Apple Valley, MN 55124-5896

Principal Residential Mortgage
PO Box 711
Des Moines, IA 50392-0001

and delivered by e mail notification under CM/ECF on the day efiled with the Court to each of
them as follows:

Joseph  L Kelly

John A. Hedback

U.S.Trustee

And I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: September 29, 2010

                       /e/ Maria Boelen_____
                       Maria Boelen

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In Re:                                          CHAPTER 7 CASE

Kathleen Carol Sherman                          CASE NO. 10-34681

                    Debtors.                    ORDER
_____

        This case came before the court on the motion of U.S. Bank, N.A., seeking relief from the

automatic stay imposed by 11 U.S.C. § 362.  Based on the motion and the file,

IT IS ORDERED:

        1.      That movant, its assignees and successors in interest, are granted relief from the

automatic stay imposed by 11 U.S.C. § 362 with regard to the mortgage deed dated December

23, 2002, executed by Kathleen C Sherman, unmarried, recorded on March 07, 2003, as

Document No. 2011165, covering real estate located in Dakota County, Minnesota, legally

described as:

        Unit No. 51, Prairie Crossing Villas, Common Interest Community No. 241,  a
        condominium located in Dakota County, Minnesota.

and may pursue its remedies under state law in connection with the mortgage deed.

        2.      Notwithstanding Fed. R. Bankr. P. 4001(a)(3), this order is effective immediately.

Dated:
                                        _____
                                        United States Bankruptcy Judge